(No. 17318.—Reversed and remanded.)
THE ILLINOIS POWER AND LIGHT CORPORATION, Appellant,
*vs.* ALTA MURDOCH LUMMIS *et al.* Appellees.

*Opinion filed December 23, 1926.*

EMINENT DOMAIN—*what are not proper elements of damage to
farm by erection of power transmission line.* In estimating damages to farm land outside of a strip over which a power transmission line is supended only the inconvenience to farming operations should be considered, and unforeseen accidents, such as wires falling down or stock or machinery becoming caught in the towers, are not proper elements of damage. (*Illinois Power and Light Corp.*
v. *Talbott,* 321 Ill. 538, and *Same* v. *Cooper,* 322 id. 11, followed.)

APPEAL from the Circuit Court of Knox county; the
Hon. W. C. FRANK, Judge, presiding.

HERBERT HAASE, MARSH, RICE, LEWIS & THOMPSON,
and BURTON & HAMILTON, for appellant.

ALVAH S. GREEN, GEORGE C. GALE, and R. L. STUART,
for appellees.

Mr. JUSTICE HEARD delivered the opinion of the court:

October 3, 1925, appellant instituted condemnation proceedings in the circuit court of Knox county to acquire a right of way and easement for an electric transmission line over a strip of land three rods in width in the southeast quarter of section 26, township 13, north, range 2 east of the fourth principal meridian, owned and occupied by appellees as farm land in Knox county. Cross-petitions were filed by appellees, in which they alleged damages to lands in the southeast quarter not included in the three-rod strip and to the south half of the northwest quarter of the section, which latter tract was described as connected with the southeast quarter by a 16-foot right of way at the center of the section, so as to constitute said lands contiguous tracts. The approximate area of the strip was slightly

over three acres. Four towers were to be located thereon. The foundation of each tower was to lie within an area not exceeding 25 feet square, and at the ground line no tower would exceed 19 feet square. The four foundations combined approximated one-twenty-fifth of an acre of land. The towers were spaced at intervals of not less than 640 feet. The towers were to be of a lattice-type construction, more or less open, with members of galvanized steel. The foundations were to be set in cement at a depth of 10 feet. To each tower were to be secured three cross-arms, the lowest thereof on two of the towers being 44 feet above the ground and on the other two 49 and 54 feet above the ground, respectively. Six transmission wires or conductors were to be suspended from insulators carried by the cross-arms at a height at the towers in no case less than 40 feet above the ground and with a minimum clearance above the ground at the lowest point never less than 20 feet. The average normal clearance at the lowest point of span would be 23 or 24 feet. Each tower was to be grounded, so that no one in contact with the tower would receive a shock. The line was provided with automatic devices or circuit protectors, operating, in the contingency of overloading or of a wire falling, by instantaneously opening a switch.

Appellant averred that it did not seek to acquire the fee to the strip and disclaimed necessity or desire for exclusive use or occupancy of any portions of the strip except the portions occupied by the towers. It averred that it sought to acquire only the right to the use of, or an easement in, upon and over, the strip for the location, assembling and erection thereon of its towers, with cross-arms and appliances, the suspension above and over the strip of its transmission conductors, and the right to assemble, construct, maintain, replace, use and operate the same, with necessary ingress and egress therefor or for other proper purposes in connection with the transmission line over the strip. By

its amended bill of particulars in evidence appellant agreed that it would not fence the strip; that if there were any fences upon the strip which it was necessary to remove in constructing and maintaining its transmission line over the strip it would replace such fences in as good condition as before removal; that it would not suspend upon or over the strip any telephone or signal wires either from the towers described in the original petition or from other supports, and that it would have ingress to and egress from said strip only at the ends thereof and not upon or by means of lands contiguous thereto and would not use or encroach upon such adjacent lands for any purposes whatsoever; that the patrolling of the transmission line would be by employees on foot, only. The evidence was that patrolling generally would occur at intervals of approximately once a week, or at times two weeks, or as necessary, depending upon conditions.

The course of the three-rod strip across the southeasterly portion of the southeast quarter of section 26 is approximately 2680 feet and in a generally northeasterly and southwesterly direction. About 40 acres were southeast of the strip. The farm buildings were located upon this latter acreage. They comprised a seven-room house, which had been built about fifty years, a small four-room house, two barns, a hog house and machinery shed. The larger house was 800 feet from the three-rod strip at its nearest point. Of the 160 acres, 15 were in meadow, 14½ in house and barn lots, and the balance tilled land.

Evidence was introduced by appellees not only as to the damage to the balance of the three-rod strip outside of the tower sites but as to damage to the lands adjacent to the strip. One of the witnesses for appellees gave it as his opinion that the damage to the land outside of the strip would be $25 an acre, and as a partial basis for this estimate thought that there was some danger to a man on top of a load of grain or hay, with a pitchfork over his

shoulder, going under wires with a heavy voltage. He also thought that as the strip was patrolled by employees of the power line they would damage the fences; that the company would not cut the weeds around the towers, and that there would be damage for that reason. He also thought that there would be inconvenience in farming the land by reason of the towers out in the middle of the field. He stated that one big element he had taken into consideration in fixing his estimate was that there would be a flaw in the title to the farm by reason of the strip running through the farm. Another element, in his opinion, was that the wires might come down just at the time for planting corn, and that this might cause a delay of a week or two in planting. Another witness, who fixed the damage at $25 an acre for the 160 acres and $1000 for the 80 acres, gave as one of the elements which he had considered, the danger of the electric wires falling upon a man. Another witness, who fixed the damage at $25 an acre for the 160-acre tract and $10 an acre for the 80 acres, stated that in estimating these damages he had in mind a matter of sentiment among buyers. Another witness gave it as his opinion that the strip would be damaged its entire value and the rest of the farm $30 an acre. Upon cross-examination he based his answer upon the danger from high-tension wires and upon other things which he did not state. Another witness gave it as his opinion that the strip would not be worth anything, as the towers belonged to the company, and that the damage to the farm would be $25 an acre. On cross-examination, as the basis of his testimony, he said he had in mind the towers upon the land and that patrolmen could pass through every day or week to watch the line; that there would be danger of going under the wires on top of a high load. He also thought that the patrolmen of the company might possibly carry disease from other farms, and as a particular element of damage he thought of the flaw in the title caused by the power company's easement. Another witness gave

it as his opinion that the entire value of the strip would be destroyed and the balance of the farm would be damaged $25 an acre. He stated that a farmer driving a team around the towers might break the machinery. Another danger that he took into consideration was that stock might get fast in the towers. Another danger was that children might climb the towers and get killed, and that great danger might result from an employee patrolling and carrying cholera. Another witness gave it as his opinion that the erection of a tower upon a farm would damage the entire farm even if 80 acres of it was a half-dozen miles from the tower. Another witness interrogated on cross-examination as to whether the opinion that the location of the line caused damage was not just a matter of sentiment and that there was no actual damage to the selling value of the adjacent land, answered, "The sentiment is a tremendous factor in buying a farm." Other witnesses in fixing their estimates as to the damage to the land outside of the strip gave it as their opinion that when the owner wanted to sell the farm he could not give a good title outside of the three-rod strip.

By its verdict the jury found just compensation for the land taken (being the portion of the strip occupied by the towers) to be $10, assessed damages to the balance of the strip over which the conductors were to be suspended in the sum of $375, and damages to the lands outside of and adjacent to the strip in the sum of $4085. Motion for a new trial was overruled and judgment rendered upon the verdict, from which judgment an appeal has been taken to this court.

The errors assigned by appellant for reversal of the judgment are, that the lands not taken adjacent to the three-rod strip were not subject to recoverable damages, the damages for the easement over the three-rod strip outside of the tower sites were excessive and founded upon incompetent evidence, and the court erred in ruling upon the admission and exclusion of evidence. This court has

recently in *Illinois Power and Light Corp.* v. *Talbott,* 321 Ill. 538, *Same* v. *Cooper,* 322 id. 11, and *Same* v. *Parks,* 322 id. 313, (three power-transmission line right of way cases,) fully considered the nature and character of damages for which a recovery might be had upon a cross-petition in a case of this kind for damages to land not taken, the measure of damages in such case, the proper elements to be considered by the jury in estimating such damages, and the competency of opinion evidence based upon improper elements of damage. All of the questions involved in this appeal were fully discussed in the opinions in those cases, and no good purpose would be subserved in unduly lengthening this opinion by a re-discussion of the same. Suffice it to say, that when the record in this case is tested by the rules announced in those opinions, we find that much of the evidence submitted to the jury was incompetent and not proper to be considered by them in arriving at their verdict.

The judgment of the circuit court is therefore reversed and the cause remanded.    *Reversed and remanded.*